### DRAPER v. SKERRETT et al.

(Circuit Court, E. D. Pennsylvania. March 3, 1902.)

No. 43.

1. JURISDICTION OF FEDERAL COURTS—AMOUNT IN CONTROVERSY—SUIT FOR INFRINGEMENT OF TRADE-NAME.

In a suit to restrain infringement of a trade-name not registered as a trade-mark, the injury to complainant's business from the infringement, past and prospective, measures the amount in controversy, for the purposes of federal jurisdiction.[1]

2. TRADE-MARKS—GEOGRAPHICAL AND DESCRIPTIVE WORDS—"FRENCH TISSUE."

The words "French Tissue," as applied to a thin paper dressing for corns, originating in France, cannot be appropriated as a trade-mark; the

---

[1] Jurisdiction of circuit courts as determined by amount in controversy, see notes to Auer v. Lombard, 19 C. C. A. 75, and Tennant-Stribling Shoe Co. v. Roper, 36 C. C. A. 459.

first being broadly geographical, and the second descriptive of the texture of the paper.[2]

8. SAME—UNFAIR COMPETITION.

Although a trade-name is of such a character that it cannot be monopolized as a trade-mark, it may by use acquire a secondary meaning, as designating the goods of a particular manufacturer, which will entitle him to an injunction against its use by another, as unfair competition, where a fraudulent intent is shown, or may be justly inferred from the circumstances of such use.[3]

4. SAME—USING TRADE-NAME AND SIMULATING DRESS.

Plaintiff purchased from France a thin emollient paper dressing for corns, etc., known as "Papier Fayard," which he put up in a different and more useful and attractive form, and sold under the name of "French Tissue." It became known by such name in this country, and acquired a considerable sale. Defendants, through an arrangement with plaintiff, acquired the sole right to handle such preparation in certain localities; and plaintiff furnished it to them in specially colored envelopes, upon which their name appeared, but with plaintiff's as proprietor. Subsequently defendants began putting up and selling a similar preparation for themselves under the same name of "French Tissue," and using a dress, both as to the squares of paper themselves, the envelopes in which they were sold, and the advertising circulars inside, closely simulating that of plaintiff. Held, that whether the relation of defendants to plaintiff was that of sales agents, or merely customers, it was clear that they were attempting to take advantage of such relation, and the trade thereby acquired, to substitute in such trade their own preparation for that of plaintiff by adopting the name and simulating the symbols, devices, and display by which plaintiff's preparation was identified and had become known to customers, and that plaintiff was entitled to an injunction restraining them from using, not only the simulated dress, but also the name.

In Equity. Suit to restrain infringement of trade-name. Hearing on bill, answer, and proofs.

Edward Brooks, Jr., for plaintiff.
Michael J. Ryan and John W. Jennings, for defendants.

. ARCHBALD, District Judge.[4] The question of jurisdiction has been raised, and is therefore the first to be disposed of. If this were a suit for the infringement of a registered trade-mark, under the statute (Act March 3, 1881; 21 Stat. 502), the court would have jurisdiction without regard to the amount in controversy (section 7). But as it stands, whatever is required to give jurisdiction must appear. Elgin Nat. Watch Co. v. Illinois Watch Case Co., 179 U. S. 665, 21 Sup. Ct. 270, 45 L. Ed. 365. It is to be remembered, however, in the present instance, that the plaintiff proceeds for the purpose of protecting his trade-name; and it is the value of that name, as measured by the damages to it, not only present, but prospective, which

---

[2] Use of geographical names as trade-marks, see notes to Hoyt v. J. T. Lovett Co., 17 C. C. A. 657, and Railway Co. v. Paul, 35 C. C. A. 642.

[3] Unfair competition, see notes to Scheuer v. Muller, 20 C. C. A. 165, and Lare v. Harper, 30 C. C. A. 376.

[4] Specially assigned.

determines the amount in controversy. This the plaintiff·avers in the bill to be above the sum of $2,000, and I think the claim is· sustained by the evidence. The trade per year taken away by the defendants, if not restrained, would soon exceed that sum, if it does not now do so; and, as already intimated, that is the real guide. The damages to be awarded for the injury already inflicted are merely incident to the general relief prayed for, and do not control the question.

It must be admitted that the plaintiff has no right to use the term "French Tissue" as a trade-mark for the emollient paper which he puts up and puts upon the market. The word "French" is broadly geographic, indicating its origin, and the word "Tissue" is descriptive of its texture, and was applied to it in France, from whence it comes, long before it was introduced into this country. Neither singly, therefore, nor in combination, can these words be so employed. Canal Co. v. Clark, 13 Wall. 311, 20 L. Ed. 581; Lawrence Mfg. Co. v. Tennessee Mfg. Co., 138 U. S. 537, 11 Sup. Ct. 396, 34 L. Ed. 997; Brown Chemical Co. v. Meyer, 139 U. S. 540, 11 Sup. Ct. 625, 35 L. Ed. 247; Elgin Nat. Watch Co. v. Illinois Watch Case Co., 179 U. S. 665, 21 Sup. Ct. 270, 45 L. Ed. 365; Brennan v. Dry Goods Co., 47 C. C. A. 532, 108 Fed. 624. This is not to deny, however, that even geographical or local names, or those which originally were merely descriptive, may become so associated in an acquired or secondary significance with the goods manufactured or· produced by a particular person as to identify and designate them in the general market as his especial production. Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118; Elgin Nat. Watch Co. v. Illinois Watch Case Co., 179 U. S. 665, 21 Sup. Ct. 270, 45 L. Ed. 365; Pillsbury-Washburn Flour Mills Co. v. Eagle, 30 C. C. A. 386, 86 Fed. 608, 41 L. R. A. 162; La Republique Française v. Saratoga Vichy Springs Co., 46 C. C. A. 418, 107 Fed. 459; Shaver v. Heller & Merz Co., 48 C. C. A. 48, 108 Fed. 821; American Waltham Watch Co. v. U. S. Watch Co., 173 Mass. 85, 53 N. E. 141, 43 L. R. A. 826, 73 Am. St. Rep. 263; Wotherspoon v. Currie, L. R. 5 H. L. 508; Montgomery v. Thompson [1891] App. Cas. 217; Reddaway v. Banham [1896] App. Cas. 199. But that is really another matter, and, however cognate, is sustained upon a different principle. It constitutes, not a trade-mark, but a trade-name, and is protected only where it is infringed by what has come to be known as "unfair competition." It is upon this that the plaintiff, having no valid trade-mark, is compelled to rely.

It may seem somewhat of a refinement to hold that certain terms are not entitled to protection as a trade-mark, and yet that their use may be restrained to the same extent as if they were, under the claim of a trade-name and the plea of unfair competition. This is evidently in the mind of Mr. Justice Brown in Brown Chemical Co. v. Meyer, 139 U. S. 540, 11 Sup. Ct. 625, 35 L. Ed. 247, where he says:

"But if the words * * * cannot be appropriated as a trade-mark, it is difficult to see upon what theory a person making use of these or similar words can be enjoined."

But it is nevertheless true that even without any strict proprietary interest, as a trade-mark, in the terms employed, a party is entitled to protection against the unfair use of them by another in the effort to take away the trade or custom which he has built up. This is established by a host of cases, which it would be an affectation to attempt to cite, but it is important to note the principle upon which they proceed. To justify a court of equity in interfering, there must be something more than the mere duplication by the one party of the other's trade-name. This is found in the deceptive use of imitative methods of display, or other devices by which the public are led into buying the infringer's goods when they intended to buy those of the original producer. The fraud which is thus perpetrated is a legitimate ground for equitable interference, and is the practical basis of it. As said by Mr. Chief Justice Fuller in Elgin Nat. Watch Co. v. Illinois Watch Case Co., 179 U. S. 665, 21 Sup. Ct. 270, 45 L. Ed. 365:

"The essence of the wrong consists in the sale of the goods of one manufacturer or vendor for those of another." And again: "Such circumstances must be made out as will show wrongful intent in fact, or justify that inference from the inevitable consequences of the act complained of."

So it is said by Lord Herschel in Reddaway v. Banham [1896] App. Cas 199:

"In a case of this description, the mere proof by the plaintiff that the defendant was using a name, word, or device, which he had adopted to distinguish his goods, would not entitle him to any relief. He could only obtain it by proving further that the defendant was using it under such circumstances and in such manner as to put off his goods as the goods of the plaintiff."

The rule is forcibly put by Mitchell, J., in Brown v. Seidel, 153 Pa. 74, 25 Atl. 1064, who, though dissenting from the rest of the court, expresses the true principle:

"Where the imitation is with intent to acquire, wrongfully and in an underhand manner, a portion of another's good will or business, equity will enjoin the attempt, as a fraud, though the imitation be not of a legal trademark. And such intent may be gathered from imitation of name, descriptive words used, size or style of package, color or shape or mode of application of label, general appearance, or any circumstances which afford basis for the inference of an intent to copy; and, where such intent is thus indicated, the actual resemblance need not be so close as to deceive any but the most careless buyers. It is enjoined, not as a deception of the public likely to be successful, but as an attempt to defraud the plaintiff. Any rule short of this is a premium on dishonesty, and an invitation to a commercial policy which measures its actions, not by conscience or right, but by ingenuity in dodging the law."

Judged by these tests, the relief asked for in the present instance should be granted. The facts which justify this conclusion are not in serious dispute. The plaintiff, a druggist of Springfield, Mass., while in Europe in the summer of 1889, was attracted by a thin paper dressing for corns and bunions which he found in use in Paris under the name of "Papier Fayard." The paper was prepared according to a registered formula, and was sold in strips or rolls about 12 by 15 inches in size, at 25 cents a roll; but in that shape the preparation spread upon it hardened and cracked after a time, and peeled off.

116 F.—14

and Mr. Draper conceived the idea of protecting the surface with a waxed covering, cutting it into smaller, flat pieces, and putting them in envelopes ready for use. To the article so made up he gave the name of "French Tissue." This he had prominently printed on the face of the envelope, accompanied by a representation of the Eiffel Tower and certain lettering commending the merits of the preparation, and giving directions for its use, with his own name and address at the foot. He also used a small brown label, with the words "French Tissue," also carrying brief printed directions. In the envelope, along with the paper, was a circular or wrapper, on the face of which was printed a catching reference to Paris and the Eiffel Tower, leading up to an encomium of the tissue itself, while on the other side was an advertisement of the plaintiff's other preparations. From that time to this he has put up the paper in this fashion, and has acquired a considerable trade in it. Some time in February, 1896, Mr. Skerrett, one of the defendants,—a prominent firm in Philadelphia,—called on Mr. Draper, at Springfield, and solicited an arrangement by which they could handle the tissue in New York and Philadelphia. Without going into details, the result of that and subsequent negotiations was an agreement that the defendants should have the exclusive sale in the two cities mentioned, and were to push the trade there, taking the tissue in 10-gross lots, at $6 per gross; the price to the general trade being $9. To conform to the general color scheme of defendants' other goods, the plaintiff was to print the envelopes in blue, and to put the firm name at the foot; retaining, however, his own name as proprietor at the head. The relation so established continued until some time in June, 1898, during which period the defendants purchased quite a quantity of these goods; but, their purchases having suddenly fallen off, the plaintiff was led to look into the matter, and found that the defendants were selling a similar preparation under the same name and style, and put up in substantially the same fashion, but obtained from other sources. The reason for the change, as it now develops, was this: The defendants had discovered that the preparation of the plaintiff was none other than "Papier Fayard," well known in commerce, which they could obtain direct from the original makers at much less cost, and put up in packets for themselves. This they proceeded forthwith to do, which was, of course, their privilege, provided they did it in a legitimate way. The difficulty is that they did not. Not only did they appropriate the trade-name by which the plaintiff had put the article upon the market, but they imitated to the smallest particular the style, manner, and design by which it had been done. The paper was cut into the same-sized pieces; a waxed covering was put over it; a brown label, with the name and directions, was attached; it was wrapped up in a printed circular, on the face of which was printed the same catchy reading matter, closing with a commendation of the dressing; and all was inclosed in an envelope embellished with a design so closely following that adopted by the plaintiff that intending purchasers could not help but be deceived by it. But the eye is the best guide, and here are the two envelopes for a comparison:

Plaintiff's Envelope, Label, and Wrapper Furnished to Defendants.

## What to See in Paris.

THE visitor to France will find interest to center in Paris, gay and beautiful, rich in architectural beauty, teeming with historic association. Favored in its mild and genial climate, replete with endless novelty, the abode of fashion and gorgeous spectacles, the home of gaiety and enjoyment, in fact the paradise of pleasure seekers—this is Paris. And with her courteous people the visitor is completely captivated, and impressed with the wealth of sights; yet if called upon to speak of things of deepest interest would say: the people! and the tower! yes the Eiffel tower, rising in its fair proportions and in a lace-like shaft, 984 feet high, capable of holding at one time 10,000 people. And, then, the gaiety of the people! If we should search for the source of the good spirits, and quick, gay step of the Parisians, we would find that the free use of the French Tissue, keeping the feet in such good condition, has something to do with it, and that all Parisians can't help being gay. Upon my visit to this city of sunny France in 1889, I was impressed with the virtue of this dressing for the feet, and which works so favorably relieving the pain and inflammation of Bunions, Corns, etc. With proper treatment all pain in the joints, all hard and soft corns can be removed. I was able to arrange for the sale of this remedy in the United States, and most cordially recommend it for all tender joints and any form of hardened flesh, corns, bunions and inflamed places upon the feet. It is clean and comfortable to use, superior to salves, plasters, and all other remedies. Sold by

## THE SILVER SUDS MFG. CO.,
### PHILADELPHIA, PA.
#### For Sale by Druggist and Department Stores.

**Defendants' Envelope, Label, and Wrapper.**

## COLUMN VENDOME.

COLUMN VENDOME was erected by Emperor Napoleon in 1810 in the City of Paris, to commemorate the success of his arms in the German campaign of 1805. The site of the Column is in the center of an octagon at the south end of Rue de la Paix, one of the finest of all the fine streets of Paris. None of the existing monuments of that city convey a better impression of the magnitude of the designs of Napoleon than the Vendome Column. It is 142 feet high and 13 feet in diameter. The pedestal and shaft are of stone covered with bronze bas-reliefs, cast out of 1200 pieces of Russian and Austrian cannon, representing the victories of the French army. The metal employed weighs about 360,000 pounds. Four eagles weighing 500 pounds each, stand at the corners of the pedestal, supporting garlands of oak. The bas-reliefs of the shaft pursue a spiral direction to the capital, displaying the principal actions, from the departure of the troops from Boulogne to the battle of Austerlitz; the length of the scroll is 840 feet. Above the capital is a gallery, approached by a winding staircase of 176 steps. The capital is surmounted by an acroterium, upon which was placed a statue of Napoleon as Emperor. This column was thrown down by the communes in 1871 but was restored in 1875. It surpassed all other columns as does Medicated French Tissue for the relief and cure of Corns, Bunions, Ingrowing Nails, Inflamed Joints, Friction, Bruises and all similar inflammations. Perfectly harmless, clean, no pressure, giving immediate relief, surpasses liquids, salves, etc. Once used always used.

## THE SILVER SUDS MFG. CO.,
### PHILADELPHIA, PA.
#### For Sale by Druggist and Department Stores.

It is useless to contend that there was no intention to imitate. The attempt to catch the trade that had been attracted by the name, style and device by which the plaintiff had made his goods known is too manifest to be successfully controverted. Nor is this weakened by the fact that the packages which the defendant had handled for the plaintiff had their name printed on them, and were colored blue, instead of red, to correspond with their other articles. The plaintiff was none the less the producer, nor the trade any less his. It was his goods that were being sold, dressed out in the way in which he had dressed them; his proprietorship being set out thereon. As said by Sanborn, J., in Shaver v. Heller & Merz Co., 48 C. C. A. 48, 108 Fed. 821:

"One does not lose the good will of his trade in an article of his manufacture by placing upon it the name of his customers who are engaged in selling it, nor by the fact that the customers know only the name and excellence of the article, and neither know or care who makes it."

The unfair competition resorted to by the defendants, as the case stood at the time the bill was filed, is therefore established, and the plaintiff is entitled to the relief against it which he has sought.

In reaching this conclusion, several matters are necessarily disposed of which were given more or less prominence at the hearing, but are not, in my opinion, controlling. For instance, it is of no especial concern whether the defendants occupied the position of sales agents, or were merely customers. The breach of faith might be the greater in the one instance than the other, but it is enough in either. By the intermediary position which they occupied, the defendants were able to take peculiar advantage of the situation, and they did so, and that is all there is about it.

Neither is it very material whether this preparation had been previously known in the American market by the name of "French Tissue." In my opinion, it had not; and I am prepared to so find, if it is necessary. The weight of the evidence is that way, and those who have expressed themselves to the contrary, I think, are mistaken; the experiences of the last ten years being taken by them for that which was earlier. And at most the use of that term could only have been occasional; the real name of the preparation, as it came in rolls, being "Papier Fayard." But I will not stop to justify my conclusions. It is sufficient for our present purposes that at the time of the acts complained of in the bill the name was associated with the preparation as put up by the plaintiff, and identified by the symbols, devices, and display by which he had made it known to the public; and on this the defendants had no right to infringe.

Nor does it matter that the plaintiff was not the original manufacturer, the basis of his preparation being an article of commerce imported from France. He at least dressed it in a new and convenient way, and one which caught the public eye and custom. If there was no merit in his treatment, why have the defendants been at such pains to copy it? There is no question, therefore, as to the infringing character of the devices in use by the defendants at the time the bill was filed; but since then they have somewhat modified their envelopes, employing one of which the following is a copy, the label and wrapper remaining unchanged:

Does this avoid the charge of infringement made against the other? I regret to say that it does not. No doubt, when you put this envelope side by side with that of the plaintiff, there are many differences which come out plainly by the comparison. But the question is whether they are such as the public are likely to note, or are still of a character to confuse and deceive them. As said by Mitchell, J., in Brown v. Seidel, 153 Pa. 74, 25 Atl. 1064, already quoted, "The actual resemblance need not be so close as to deceive any but the most careless buyers." The defendants still appropriate the name "French Tissue," which is prominently displayed in large type on the face of the package, and the same directions and commendations appear as before. Even the Vendome column, imitative of the plaintiff's Eiffel tower, is there,—balanced, it is true, on the other hand, by Bunker Hill monument, but none the less deceptive because of this patriotic addition. Why was it necessary to duplicate and copy in this fashion, unless there was some object to be attained by it, and what object could there be, except to catch the existing trade? Surely there is no peculiar association between the different emblems put together on the plaintiff's envelope and the corn plaster which they are designed to sell, so that they cannot be safely omitted by the defendants; and with the many artists in the land and the innumerable designs which they are capable of executing, something just as appropriate and equally as taking can be produced, without the close adherence which we here find to those which the plaintiff has adopted. In view of this, it is difficult to persuade oneself that the resemblance is innocent, or has been so far removed as to escape offense. And I am, on the contrary, compelled to conclude that there has been an effort to appropriate and have the benefit of the existing trade in "French Tissue," and that, in order to do so, the defendants have kept as near as they dare to the symbols by which it has become known. This is too near to satisfy equity and honest trade, and must be given up.

Let a decree be drawn awarding a permanent injunction substantially as prayed for in the bill, and referring the case to a master to assess the damages. The discussion of what is the true measure in a case of this kind will be deferred until the coming in of his report.