SHAVER et al. v. HELLER & MERZ CO.

(Circuit Court of Appeals, Eighth Circuit. April 29, 1901.)

No. 1,474.

**1. UNFAIR COMPETITION—INJUNCTION PROPER RELIEF.**
The sale of the goods of one manufacturer or vendor as those of another is unfair competition, and constitutes a fraud which a court of equity may lawfully prevent by injunction.[1]

**2. TRADE-MARKS—GEOGRAPHICAL AND DESCRIPTIVE WORDS MAY NOT BE.**
Geographical terms and words descriptive of the character, quality, or places of manufacture or of sale of articles cannot be monopolized as trade-marks.[2]

**3. SAME—USE OF, IN UNFAIR COMPETITION, MAY BE ENJOINED.**
But the use of such geographical or descriptive terms to palm off the goods of one manufacturer or vendor as those of another, and to carry on unfair competition, may be lawfully enjoined by a court of equity to the same extent as the use of any other terms or symbols.

**4. SAME—PROPRIETARY INTEREST IN, NOT ESSENTIAL TO INJUNCTION AGAINST USE.**
A proprietary interest in the terms or symbols used to palm off the goods of one manufacturer or vendor as those of another, or to commit any other fraud, is not essential to the maintenance of a suit to enjoin the perpetration of the wrong, but an interest in the good will of the business or in the other property threatened is sufficient.

**5. "AMERICAN"—USE OF TO CREATE UNFAIR COMPETITION ENJOINED.**
A manufacturer had applied to certain articles which it made the names "American Ball Blue" and "American Wash Blue" until they became well known to the trade and the public by these names, and commanded a large and lucrative trade. A firm of merchants applied these names to goods of other manufacturers, and offered them for sale under these names for the purpose of diverting complainant's trade to themselves. *Held*, the use of these names and of the word "American" therein by the defendants was properly enjoined.

**6. UNFAIR COMPETITION—ATTACHING NAMES OF FRAUDULENT DEALERS WILL NOT EXCUSE.**
One who offers the goods of one manufacturer under the well-known names and established reputation of articles of another manufacturer

[1] Unfair competition in trade, see notes to Scheuer v. Muller, 20 C. C. A. 165; Lare v. Harper & Bros., 30 C. C. A. 376.

[2] Use of geographical names, see notes to Hoyt v. J. T. Lovett Co., 17 C. C. A. 657; Illinois-Watch-Case Co. v. Elgin Nat. Watch Co., 35 C. C. A. 242.

for the purpose of deceiving the public and defrauding the latter aggravates, rather than justifies, his wrong by placing his own name upon the packages.

7. EQUITY—WRONG OF COMPLAINANT BARRING RELIEF MUST RELATE TO EQUITY SUED FOR.

The principle, "He who comes into equity must do so with clean hands," repels a complainant only when his iniquity has an immediate and necessary relation to the equity for which he sues.

Thayer, Circuit Judge, dissenting.

(Syllabus by the Court.)

Appeal from the Circuit Court of the United States for the Northern District of Iowa.

This is an appeal from a decree which enjoins the appellants, Isaac H. Shaver, Frederick H. Shaver, James E. Blake, and Ella Bever-Blake, copartners as Shaver, Blake & Co., from using the brands or names "American Ball Blue" and "American Wash Blue" to palm off bluing made by parties other than the appellee, the Heller & Merz Company, a corporation, as the bluing made and sold by that corporation. 102 Fed. 882. The chief objection assigned to the decree is that it forbids the appellants to use the word "American" to deceive the public and to defraud the appellee, while the latter has no proprietary interest in that word, or in its exclusive use.

Charles K. Offield (Henry S. Towle, Charles C. Linthicum, and U. C. Blake, on the brief), for appellants.

Edmund Wetmore (Archibald Cox, on the brief), for appellee.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the case as above, delivered the opinion of the court.

May a court of equity lawfully enjoin one from using the word "American" to sell the goods of one manufacturer as those of another to the damage of the latter and the deceit of the purchasers? This is the real issue which this case presents. It arises out of this state of facts: The appellee is a corporation which succeeded in 1889 to the business of manufacturing and selling bluing which had been established in the state of New Jersey by Heller & Merz in 1869. In 1872 the predecessors of the appellee put upon the market bluing of their manufacture in small round balls under the name "American Ball Blue," and from that time until 1898 they continued to make and sell this form of bluing under this name. By energy, enterprise, and perseverance they established a large demand for, and a lucrative trade in, this specific article of their manufacture. In 1898 there were many different names used to· distinguish the origin or ownership of the various bluings upon the market in the form of balls. Among these were the ."American Ball Blue" of the appellee, the "National Ball Blue," the "Royal Ball Blue," "Sauer's Ball Blue," and "Fischer's Ball Blue." The article made by the appellee became known to the trade by its name, quality, and character, and it was generally ordered, bought, and sold by its title "American Ball Blue." No one but the appellee had ever made or sold any bluing under this name, and the appellee's use of it had been continuous, notorious, and exclusive. In 1897 the appellants bought the business of a firm of soap makers at Cedar Rapids, in the state of Iowa, styled G. M. Olmsted & Co. Olmsted & Co. had for many

years purchased of the appellee bluing of its manufacture styled "American Wash Blue," but they had never bought or sold the American ball blue. In the early part of the year 1898 the appellants bought bluing made by others than the appellee, and very properly issued notices to the trade that after May 1, 1898, the "American Wash Blue" which their predecessors, Olmsted & Co., had been selling, would be succeeded by the "Salome Laundry Blue." But in July of that year, after an effort to sell the Salome blue for two months, their cupidity seems to have overcome their honesty, and they proceeded to solicit purchasers, and to make sales of bluing not made by the appellee at greatly reduced prices, under the names "American Ball Blue" and "American Wash Blue." In their correspondence they called these names their brands, and styled themselves "Manufacturers of American Ball Blue, American Wash Blue," although they never made any bluing of any kind, and never purchased any of these articles which they pretended to sell. Upon the packages in which they shipped the articles which they sold they placed their own names and their residence, Cedar Rapids, Iowa, and by colors and in other ways differentiated the dress of their goods from that of those manufactured by the appellee. But, as the appellee's bluing was generally ordered and sold by correspondence and by its names, these differences in the dresses of the packages did not prevent, and cannot prevent, the fraud and deceit which the appellants perpetrate by the use of these names, and by soliciting orders for and selling their goods under them. The result of this course of action on the part of the appellants was that they diverted to themselves a large portion of the trade of the appellee in the West, and reaped the benefit of the established reputation of its goods.

The history of the American wash blue differs to some extent from that of the American ball blue. The predecessors of the appellee applied the former name in 1874 to bluing of their manufacture in the form of lozenges packed in small cylinders, and proceeded to sell it. From 1878 to 1897 the predecessors of the appellants, Pomeroy & Olmsted and G. M. Olmsted & Co., purchased this article from the appellee and from its predecessors, and sold it from their place of business at Cedar Rapids, in the state of Iowa. They advertised this article of bluing in connection with their advertisements of the soaps they were selling, and at their request the manufacturers of the bluing, in addition to putting upon the packages their trade-mark, which was the letter "U" surrounded by a triangle and the name of their factory, "American Ultramarine Works," placed the names of Pomeroy & Olmsted and G. M. Olmsted & Co. thereon. During five years of this term G. M. Olmsted & Co. bought the American wash blue of the Consolidated Ultramarine Company, Limited, but that company was a distributer for the appellee and other manufacturers, and the bluing was made and packed by the appellee or its predecessors during all this time. The customers who purchased of Pomeroy & Olmsted and of G. M. Olmsted & Co. knew the bluing, its character, and its name, but they did not know who manufactured it, and supposed Pomeroy & Olmsted or G. M. Olmsted & Co. to be its manufacturers. When the appellants purchased the

business of G. M. Olmsted & Co., they bought its good will, and they insist that they thereby became entitled to use the name "American Wash Blue" upon any bluing which they may buy and sell, whether it is manufactured by the appellee or not. The facts which condition this claim were stated more at length and were carefully considered by the court below in its opinion in Heller & Merz Co. v. Shaver, 102 Fed., at pages 882, 886. That court came to the conclusion that the appellants had no better right to use the name "American Wash Blue" to palm off the goods of other manufacturers as those made by the appellee than G. M. Olmsted & Co. had, and that the latter firm stood in such a fiduciary relation to the appellee that they could not be permitted to take such action. It held that the good will of the business established under the name "American Wash Blue" was the property of the appellee. These conclusions are, in our opinion, well founded in fact and in law. The brand "American Wash Blue" was conceived and applied to their manufacture by the predecessors of the appellee. The excellence of the article, and the introduction which the appellee gave it or induced Olmsted & Co. to give it, by the character and price of the bluing it furnished, established the trade in it, and gave that trade its value. Purchasers in the trade and the public came to know, to demand, and to buy the appellee's manufacture by this brand. The inevitable result is that the good will of this trade became the appellee's property, which neither Olmsted & Co. nor their successors could lawfully lead away from it by fraud or falsehood. One does not lose the good will of his trade in an article of his manufacture by placing upon it the names of his customers who are engaged in selling it, nor by the fact that the consumers know only the name and excellence of the article, and neither know nor care who makes it. Brewery Co. v. Powell [1897] App. Cas. 710, 716; Lichtenstein v. Goldsmith (C. C.) 37 Fed. 359.

The conclusions which must be drawn from the facts of this case, therefore, are that by industry and energy the appellee has built up an extensive and lucrative trade in the specific articles of its manufacture, which have become known to the trade and the public as "American Ball Blue" and "American Wash Blue"; that these articles are ordered, bought, and sold by mail and telegraph by their names or brands, without a view of the packages in which they are inclosed; that the appellants have put these names or brands on goods made by other manufacturers, have offered these goods to the public at reduced prices, and have solicited purchasers to buy them under these names, for the purpose and with the intent of selling these goods as the manufactures of the appellee; that they succeeded in this way in deceiving purchasers and defrauding the appellee of a portion of its trade; and that these brands cannot be used as the names of the products of other manufacturers than the appellee without creating confusion in the trade and purloining the latter's custom.

In this state of the case the appellants have been enjoined from using these names, and one of their loudest complaints is that the goods they sell are made in America, and that they are forbidden to use the word "American" to notify the public of this fact. There are

two answers to this objection: (1) That the injunction does not prohibit the appellants from using the word for that purpose, and (2) that they neither need nor seek so to use it, but their only object in trying to make use of it is to filch the good will and trade of the appellee. The injunction restrains them only from "holding themselves out to the public as the owners of the names or brands 'American Ball Blue' and 'American Wash Blue,' or as the manufacturers of the commodities heretofore known and sold under these names, or from selling or offering for sale under these names or brands, or names or brands intended to simulate the same, any blue or bluing manufactured by parties other than complainants." They insist that they have the right to state that the goods they sell are made in America, and the right to use the word "American" for that purpose. The injunction does not forbid them from doing so. They may state in their correspondence or upon their packages, notwithstanding the inhibition of the court, that their ball blue or wash blue is an American manufacture, an American article, or an American product. They may express the same idea by the declaration that it is a New York, or a New Jersey, or an Iowa product, as the case may be, and they may convey the same thought in many other ways without impinging upon the decree of the court. The truth is, however,—and there could be no more conclusive proof of it than the prosecution of this appeal,—that they do not desire to use the word "American," or any other word, for the purpose of declaring that the articles which they sell are made in America. Every one who purchases them either knows or presumes that to be the fact already. What they seek, and the only thing they really desire, is to use this word to divert to themselves the appellee's trade in American ball blue and in American wash blue, and they well know that they can accomplish this only by using it in those brands for the sole purpose of conveying to the public the falsehood that the goods they sell are made by the appellee.

Another proposition of counsel for the appellants is that the appellee has, and can have, no proprietary interest in the word "American," or in its exclusive use; and therefore it is entitled to no injunction to restrain its use by another. But an ownership and an interest in the means by which a fraud or wrong is about to be committed are not essential to the maintenance of a suit to enjoin its perpetration. A title to the property about to be injured is sufficient. One gathers the seeds of pernicious weeds, and threatens to sow them on the field of his neighbor. The latter has no proprietary interest in the seeds, but he owns the field and the crop it is producing, and these facts are sufficient to warrant any court in granting him summary relief by injunction against the threatened injury. The appellants scatter throughout the land, for the purpose of deceiving the public and diverting to themselves the trade, custom, and good will of the appellee, words and names which convey the false statements that the goods they are selling were made by the Heller & Merz Company. That company has no property in the words or in the means by which this fraud is committed, but it owns the good will,—the custom,—which the false and fraudulent use of these

words and names injures and destroys; and its proprietary interest in this good will is ample to warrant the court in enjoining its destruction by the fraud. The contention of counsel for the appellants here is a confusion of the bases of two classes of suits,—those for infringements of trade-marks, and those for unfair competition in trade. Suits of the former class rest on the ownership of the trade-marks. Suits of the latter class are founded upon the damage to the trade of the complainants by the fraudulent passing of the goods of one manufacturer for those of another. In the former, title to the trade-marks is indispensable to a good cause of action; in the latter, no proprietary interest in the words, names, or means by which the fraud is perpetrated is requisite to maintain a suit to enjoin it. It is sufficient that the complainant is entitled to the custom—the good will—of a business, and that this good will is injured, or is about to be injured, by the palming off of the goods of another as his. Lee v. Haley, 5 Ch. App. 155, 161; Flour-Mills Co. v. Eagle, 86 Fed. 608, 628, 30 C. C. A. 386, 406, 41 L. R. A. 162; Coats v. Thread Co., 149 U. S. 562, 13 Sup. Ct. 966, 37 L. Ed. 847; Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118. This is not a suit for the infringement of a trade-mark. It is a suit for unfair competition, for selling goods of the appellee as those of another. For this reason no proprietary interest in the word "American" or in the names whose use is enjoined was essential to the issue of the injunction.

For the same reason this case is not governed nor affected by the principle that geographical terms and words descriptive of the character, quality, or place of manufacture of an article are not capable of monopolization as trade-marks. Canal Co. v. Clark, 13 Wall. 311, 321, 20 L. Ed. 581; Mill Co. v. Alcorn, 150 U. S. 460, 464, 14 Sup. Ct. 151, 37 L. Ed. 1144; Iron Co. v. Uhler, 75 Pa. 467, 15 Am. Rep. 599; Chemical Co. v. Meyer, 139 U. S. 540, 546, 11 Sup. Ct. 625, 35 L. Ed. 247; Continental Ins. Co. v. Continental Fire Ass'n (C. C.) 96 Fed. 846. There is no claim that the words whose use is enjoined constituted trade-marks, but this case rests upon the broad proposition that every man must so use his own as to inflict no unnecessary damage upon his neighbor. Under this principle the appellants had the right to buy and sell ball blue, but they had not the privilege to so exercise that right as to unnecessarily injure the business of the appellee. Right here is the broad distinction between this case and Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118; Centaur Co. v. Heinsfurter, 84 Fed. 955, 958, 28 C. C. A. 581, 584, 56 U. S. App. 7, 13; and Centaur Co. v. Marshall, 97 Fed. 785, 38 C. C. A. 413. In those cases the words whose use the plaintiffs sought to enjoin, "Singer" and "Castoria," had become the names of the things which the defendants had the same right as the complainants to make and sell. It was indispensable to their exercise of these rights that they should use the names of the things, because these were the only names by which the articles were known. The result in those cases was that the use of these names was held to inflict no legal injury on the plaintiffs, and for this reason their use was not enjoined, but the defendants

were required to distinguish as far as possible the goods which they sold from those made by the plaintiffs. In the case at bar the appellants have no right to make or sell American ball blue or American wash blue. The names of the articles in which they have the right to deal are ball blue and wash blue. These terms perfectly describe the articles, and it is not necessary for them to use the names of the articles manufactured by the appellee in the exercise of any right which they possess.

Nor is this case ruled by that class of authorities illustrated by Chemical Co. v. Meyer, 139 U. S. 540, 546, 11 Sup. Ct. 625, 35 L. Ed. 247, in which there was no satisfactory proof of an intent by the defendants to sell their goods as those of the complainants, and the dresses of the articles so distinguished them that confusion and deceit would not be likely to result. The proof of the intent of the appellants here to sell the goods of other manufacturers as those of the appellee amounts to a demonstration, and there is no practicable way other than by prohibition of the use of the name by which filching the trade of an article whose sale is solicited and made by its name can be effectually prevented.

Thus the issue in this case finally narrows to the question whether or not one has the right to use the word "American" to sell the property of one manufacturer as that of another. From the facts that "American" is a geographical term, that it may not constitute a trade-mark, that no one may have a proprietary interest in it, counsel for the appellants draw the conclusion that every one has the right to use it to palm off the goods of one vendor as those of another. Does the conclusion necessarily follow from the premises? Every one has the right to use and enjoy the rays of the sun, but no one may lawfully focus them to burn his neighbor's house. Every one has the right to use the common highway, but no one may lawfully apply it to purposes of robbery or riot. Every one has the right to use pen, ink, and paper, but no one may apply them to the purpose of defrauding his neighbor of his property, of making counterfeit money, or of committing forgery. The partner has the right to use his firm's name, but he may not lawfully employ it to cheat his copartner out of his property. Every one has the right to use his own name, but he may not lawfully apply it to the purpose of filching his property from another of the same name. The use of a geographical or descriptive term confers no better right to perpetrate a fraud than the use of any other expression. The principle of law is general, and without exception. It is that no one may so exercise his own rights as to inflict unnecessary injury upon his neighbor. It is that no one may lawfully palm off the goods of one manufacturer or dealer as those of another to the latter's injury. It prohibits the perpetration of such a fraud by the use of descriptive and geographical terms which are not susceptible of monopolization as trademarks as effectually as it prohibits its commission by the use of any other expressions. The most instructive case upon this subject, in view of the claim of counsel for the appellants that the injunction should be so modified as to permit them to use the word "American" in the names of the articles they sell on condition that they

state upon their packages and circulars the names of the manufacturers or vendors, is Thompson v. Montgomery, 41 Ch. Div. 35, 38, 47, 51; on appeal, Montgomery v. Thompson [1891] App. Cas. 217, 220. In that case the plaintiffs and their predecessors had operated a brewery at Stone, a place of about 6,000 inhabitants, and had called the ale they brewed "Stone Ale." After this ale became well known to the trade and the public, the defendant built a brewery at Stone, and called ales which he manufactured there by the same name. The question presented by the case was whether an injunction should be granted against the defendant prohibiting him from using the words "Stone Ale" without any qualification, or should simply enjoin him from using these words "so as to induce the belief that the ale sold by the defendant is the ale sold by the plaintiff." Page 38. Chitty, J., in considering the question, said:

"Now, he is clearly entitled to set up his brewery at Stone, and he is clearly entitled to brew beer and ale at Stone, and to sell them in such a manner as is not calculated to deceive. He may mention on any ale that he makes that the ale is brewed at Stone. But that is not the question. Can he honestly use the term 'Stone Ale,' having regard to what the plaintiffs have shown to be the present market meaning of that term?"—and then held that he could not do so, and granted an unqualified injunction against the use of the words. Pages 40, 41.

This injunction was sustained in the court of appeal, where Lindley, J., said:

"The evidence in this case convinces me that any ale which may be sold by this particular defendant as 'Stone Ale' will be intended by him to be passed off as the plaintiff's ale. I am satisfied that he does not use the words 'Stone Ale' for any honest purpose whatever, but, according to the evidence, with a distinctly fraudulent purpose. Is there any reason, then, why the court should not deal with him accordingly, and prevent him from carrying out such intention by restraining him from using the words which he will only use for that purpose?" Page 51.

An appeal was taken to the house of lords, and there the decree for the injunction was affirmed. Lord Herschell, delivering his opinion, said:

"They insisted that the appellant ought not to have been restrained from 'selling or causing to be sold any ale or beer not of the plaintiffs' manufacture under the term "Stone Ales" or "Stone Ale."' They contended that such an injunction was too wide in its language; that the plaintiffs had no property in the word 'Stone,' as applied to ale; and that they could not monopolize the use of the name of that town merely because for a time they had been the only brewers there, and exclude the rest of the public from employing it to describe the place of origin of such beer, as they might choose to brew there. I do not think the principle on which the court ought to act in such a case as the present is open to doubt. The respondents are entitled to ask that a rival manufacturer shall be prevented from selling his ale under such a designation as to deceive the public into the belief that they are obtaining the ale of the respondents, and he ought not the less to be restrained from doing so because the practical effect of such restraint may be much the same as if the persons seeking the injunction had a right of property in a particular name. * * * The court having come to the conclusion that he could not sell the liquor manufactured by him under that name without inducing the belief in the mind of the purchaser that he was obtaining the plaintiffs' ale,—a conclusion from which I see no ground for differing,—I do not think that it was improper to frame the injunction in the form adopted, and thus to determine the question at once, instead of

leaving it to be raised and contested on an application to commit." Montgomery v. Thompson [1891] App. Cas. 217, 220, 221.

The case before us is on all fours with that from which these quotations have been made. The appellants used the word "American" for the purpose and with the intention of selling the goods of other manufacturers for those of the appellee. They cannot use that word in the names whose use is enjoined without producing the effect which they intend. They have no right to produce this effect, or to use them for this purpose, and the action of the court below was not without the support of high authority.

In the leading case of Seixo v. Provezende, 1 Ch. App. 192, 194, decided in 1866, an injunction was issued against the use of the word "Seixo," which was the name of a region from which the wine of both parties to the suit was derived.

In Lee v. Haley, 5 Ch. App. 155, 161, an injunction was granted against the use by the defendant, who was doing business in Pall Mall, of the name "The Pall Mall Guinea Coal Company" in Pall Mall, because the plaintiff had previously become known by that name. The judge said:

"I quite agree that they have no property in the name, but the principle upon which the cases on this subject proceed is, not that there is property in the word, but that it is a fraud on a person who has established a trade, and carries it on under a given name, that some other person should assume the same name with a slight alteration, in such a way as to induce persons to deal with him in the belief that they are dealing with the person who has given a reputation to the name."

In Knott v. Morgan, 2 Keen, 213, the use of the word "London" was forbidden. Lord Langdale said:

"The right which any person may have to the protection of this court does not depend upon any exclusive right which he may be supposed to have to a particular name, or to a particular form of words. His right is to be protected against fraud, and fraud may be practiced against him by means of a name, though the person practicing it may have a perfect right to use that name, provided he does not accompany the use of it with such other circumstances as to effect a fraud upon others."

In Wotherspoon v. Currie, L. R. 5 H. L. 508, 522, 523,—a case decided in 1872,—Wotherspoon and another were the successors of a firm which had manufactured starch for many years at Glenfield until their product had become known as "Glenfield Starch." But the plaintiffs were then engaged in business at another place. Currie, the defendant, established a manufactory of starch at Glenfield, placed the name "Currie & Co." in large letters upon his packages as manufacturers thereof, and his agents proceeded to sell his product as Glenfield starch. An injunction was granted restraining him "from using the word 'Glenfield' in or upon any labels affixed to packages of starch manufactured by or for him, and from in any other way representing the starch manufactured by or for him to be 'Glenfield Starch,' and from doing any act or thing to induce the belief that starch manufactured by or for him is 'Glenfield Starch.'"

In Reddaway v. Banham [1896] App. Cas. 199, 204, 211, 215, the plaintiffs sold "camel-hair belting" under that name until the name

came to signify their belting. Thereupon the defendant made belting which was properly described by the same name, because it was belting, and was made in part of camel's hair. But, notwithstanding the fact that these words were descriptive, and might not be monopolized as a trade-mark, the defendants were enjoined from using them. Lord Halsbury, in delivering his opinion in the house of lords, stated that the case rested on the principle "that nobody has any right to represent his goods as the goods of somebody else" (page 204), and Lord Herschell said:

"In my opinion, the doctrine on which the judgment of the court of appeal was based—that, where a manufacturer has used as his trade-mark a descriptive word, he is never entitled to relief against a person who so uses it as to induce in purchasers the belief that they are getting the goods of the manufacturer who has theretofore employed it as his trade-mark—is not supported by authority, and cannot be defended on principle. I am unable to see why a man should be allowed in this way more than in any other to deceive purchasers into the belief that they are getting what they are not, and thus to filch the business of a rival." Pages 210, 211.

In Brewery Co. v. Powell [1897] App. Cas. 710, 716, the use of the words "Yorkshire Relish" was enjoined.

In North Cheshire & M. Brewery Co. v. Manchester Brewery Co. [1899] App. Cas. 83, the use of the word "Manchester" in the name of the defendant was enjoined.

The principles of law and the practice illustrated by these cases from the English courts have been sustained and followed in the courts of the United States. In American Waltham Watch Co. v. U. S. Watch Co., 173 Mass. 85, 53 N. E. 141, a defendant engaged in the manufacture of watches in Waltham, Mass., was enjoined at the suit of a prior manufacturer from using the words "Waltham Watch" or "Waltham Watches." In Flour-Mills Co. v. Eagle, 86 Fed. 608, 628, 30 C. C. A. 386, 406, 41 L. R. A. 162, an injunction was issued forbidding the use of the words "Minneapolis" and "Minnesota." In American Brewing Co. v. St. Louis Brewing Co., 47 Mo. App. 14, 20, an injunction was issued against the use of the word "American." In Cady v. Schultz, 19 R. I. 193, 195, 32 Atl. 915, 61 Am. St. Rep. 763, 29 L. R. A. 524, a defendant was enjoined from using the term "U. S. Dental Rooms" at the suit of one who had established a business under the name "United States Dental Association." In Newman v. Alvord, 49 Barb. 588, an injunction was issued against the use of the word "Akron" in the name or description of a cement. In the following cases the defendants were enjoined from using their own names to pass off their goods as those of others: Croft v. Day, 7 Beav. 84, 89, 90; Meyer v. Medicine Co., 58 Fed. 884, 887, 7 C. C. A. 558, 565, 18 U. S. App. 373, 378; Garrett v. T. H. Garrett & Co., 78 Fed. 472, 477, 478, 24 C. C. A. 173, 178, 179; Walter Baker & Co. v. Sanders, 80 Fed. 889, 26 C. C. A. 220, 51 U. S. App. 421; Tarrant & Co. v. Hoff, 76 Fed. 959, 961, 22 C. C. A. 644, 646; R. W. Rogers Co. v. Wm. Rogers Mfg. Co., 70 Fed. 1017, 1019, 17 C. C. A. 576, 578, 35 U. S. App. 843, 847, 848; Thread Co. v. Armitage, 45 U. S. App. 62, 73, 21 C. C. A. 178, 186, 74 Fed. 936, 944. In Block v. Distributing Co. (C. C.) 95 Fed. 978, 980, Fuller v. Huff, 43 C. C. A. 453, 104 Fed. 141, 144, 51 L. R. A. 332, and Williams v.

Mitchell (C. C. A.) 106 Fed. 168, the use of descriptive words such as "Standard Distilling," "Health Food," and "Carrom" was enjoined.

The leading cases in support of injunctions restraining the use of geographical terms for the purpose of selling the goods of one manufacturer as those of another are Wotherspoon v. Currie, where the use of the name "Glenfield" was enjoined, and Montgomery v. Thompson, where the use of the word "Stone" was forbidden. The principles upon which these cases rest have been repeatedly considered and affirmed by the supreme court of the United States. In McLean v. Fleming, 96 U. S. 245, 254, 255, 24 L. Ed. 828, that court said:

"Nor is it necessary, in order to give a right to an injunction, that a specific trade-mark should be infringed; but it is sufficient that the court is satisfied that there was an intent on the part of the respondent to palm off his goods as the goods of the complainant, and that he persists in so doing after being requested to desist. * * * Chancery protects trade-marks upon the ground that a party shall not be permitted to sell his own goods as the goods of another; and therefore he will not be allowed to use the names, marks, letters, or other indicia of another, by which he may pass off his own goods to purchasers as the manufacture of another. Croft v. Day, 7 Beav. 84; Perry v. Truefitt, 6 Beav. 66; Newman v. Alvord, 51 N. Y. 192, 10 Am. Rep. 588."

In Lawrence Mfg. Co. v. Tennessee Mfg. Co., 138 U. S. 537, 549, 550, 551, 11 Sup. Ct. 396, 34 L. Ed. 997, the court cites and reviews with approval Wotherspoon v. Currie and Montgomery v. Thompson, and says:

"Undoubtedly an unfair and fraudulent competition against the business of plaintiff, conducted with the intent on the part of the defendant to avail itself of the reputation of the plaintiff to palm off its goods as plaintiff's, would, in a proper case, constitute ground for relief."

In the last case in which this subject is considered—Elgin Nat. Watch Co. v. Illinois Watch-Case Co., 179 U. S. 665, 674, 21 Sup. Ct. 270, 45 L. Ed. 365, a suit for the infringement of a trademark—that court held, in accordance with the established rule, that the word "Elgin" was not susceptible of monopolization as a trademark. But it also reviewed with approval Wotherspoon v. Currie and Reddaway v. Banham, and said upon this subject:

"But it is contended that the name 'Elgin' had acquired a secondary signification in connection with its use by appellant, and should not, for that reason, be considered or treated as merely a geographical name. It is undoubtedly true that, where such a secondary signification has been acquired, its use in that sense will be protected by restraining the use of the word by others in such a way as to amount to a fraud on the public, and on those to whose employment of it the special meaning has become attached."

From the opinions which have now been reviewed and the authorities cited below the following principles may be safely deduced:

1. The sale of the goods of one manufacturer or vendor as those of another is unfair competition, and constitutes a fraud which a court of equity may lawfully prevent by injunction. Manufacturing Co. v. Spear, 2 Sandf. 599; Seixo v. Provezende, 1 Ch. App. 192, 194; Coats v. Thread Co., 149 U. S. 562, 13 Sup. Ct. 966, 37 L. Ed. 847.

2. Geographical terms and words descriptive of the character, quality, or places of manufacture or of sale of articles cannot be

monopolized as trade-marks. Canal Co. v. Clark, 13 Wall. 311, 321, 20 L. Ed. 581; Mill Co. v. Alcorn, 150 U. S. 464, 14 Sup. Ct. 151, 37 L. Ed. 1144; Chemical Co. v. Meyer, 139 U. S. 540, 546, 11 Sup. Ct. 625, 35 L. Ed. 247; Manufacturing Co. v. Trainer, 101 U. S. 51, 56, 25 L. Ed. 993; Goodyear's India-Rubber Glove Mfg. Co. v. Goodyear Rubber Co., 128 U. S. 598, 602, 9 Sup. Ct. 166, 32 L. Ed. 535; Continental Ins. Co. v. Continental Fire Ass'n (C. C.) 96 Fed. 846; Brown Chemical Co. v. Frederick Stearns & Co. (C. C.) 37 Fed. 361; Chemical Works v. Muth (C. C.) 35 Fed. 524, 1 L. R. A. 44; Illinois Watch-Case Co. v. Elgin Nat. Watch Co., 94 Fed. 667, 35 C. C. A. 237; New York & R. Cement Co. v. Coplay Cement Co. (C. C.) 45 Fed. 212; Iron Co. v. Uhler, 75 Pa. 467; Connell v. Reed, 128 Mass. 477.

3. But the use of such geographical or descriptive terms to palm off the goods of one manufacturer or vendor as those of another, and to carry on unfair competition, may be lawfully enjoined by a court of equity to the same extent as the use of any other terms or symbols. Knott v. Morgan, 2 Keen, 213; Wotherspoon v. Currie, L. R. 5 H. L. 508, 522, 523; Thompson v. Montgomery, 41 Ch. Div. 35; Montgomery v. Thompson [1891] App. Cas. 217, 220; Lee v. Haley, 5 Ch. App. 155; Seixo v. Provezende, 1 Ch. App. 192, 194; Brewery Co. v. Powell [1897] App. Cas. 710, 716; North Cheshire & Manchester Brewery Co. v. Manchester Brewery Co. [1899] App. Cas. 83; McLean v. Fleming, 96 U. S. 245, 255, 24 L. Ed. 828; Lawrence Mfg. Co. v. Tennessee Mfg. Co., 138 U. S. 537, 550, 551, 11 Sup. Ct. 396, 34 L. Ed. 997; Elgin Nat. Watch Co. v. Illinois Watch-Case Co., 179 U. S. 665, 673, 674, 21 Sup. Ct. 270, 45 L. Ed. 365; Saxlehner v. Eisner & Mendelson Co., 179 U. S. 19, 41, 21 Sup. Ct. 7, 45 L. Ed. 60; Flour-Mills Co. v. Eagle, 86 Fed. 608, 628, 30 C. C. A. 386, 406; City of Carlsbad v. Kutnow, 71 Fed. 167, 173, 18 C. C. A. 24, 30, 35 U. S. App. 750, 763; Block v. Distributing Co. (C. C.) 95 Fed. 978, 980; Meyer v. Medicine Co., 58 Fed. 884, 887, 7 C. C. A. 558, 565, 18 U. S. App. 372, 378; Garrett v. T. H. Garrett & Co., 78 Fed. 472, 478, 24 C. C. A. 173, 178, 179; Walter Baker & Co. v. Sanders, 80 Fed. 889, 26 C. C. A. 220, 51 U. S. App. 426; Tarrant & Co. v. Hoff, 76 Fed. 959, 961, 22 C. C. A. 644, 646; R. W. Rogers Co. v. Wm. Rogers Mfg. Co., 70 Fed. 1017, 1019, 17 C. C. A. 576, 578, 35 U. S. App. 843, 847, 848; Thread Co. v. Armitage, 45 U. S. App. 62, 73, 21 C. C. A. 178, 186, 74 Fed. 936, 944; Fuller v. Huff, 104 Fed. 141, 144, 43 C. C. A. 453, 51 L. R. A. 332; Williams v. Mitchell (C. C. A.) 106 Fed. 168; Salt Co. v. Burnap, 73 Fed. 818, 821, 20 C. C. A. 27, 30, 43 U. S. App. 243, 250; Saxlehner v. Apollinaris Co., 13 Times Law Rep. 258; American Waltham Watch Co. v. U. S. Watch Co., 173 Mass. 85, 53 N. E. 141; Cady v. Schultz, 19 R. I. 193, 195, 32 Atl. 915, 61 Am. St. Rep. 763, 29 L. R. A. 524; American Brewing Co. v. St. Louis Brewing Co., 47 Mo. App. 14, 20; Newman v. Alvord, 49 Barb. 488; Taylor v. Carpenter, 11 Paige, 292, 42 Am. Dec. 114; Id., 2 Sandf. Ch. 603; Croft v. Day, 7 Beav. 84, 89, 90; Reddaway v. Banham [1896] App. Cas. 199; Cochrane v. Macnish [1896] App. Cas. 225, 229.

4. A proprietary interest in the terms or symbols used to palm off the goods of one manufacturer or vendor as those of another, or to commit any other fraud, is not essential to the maintenance of a

suit to enjoin the perpetration of the wrong; but an interest in the good will of the business or in the other property threatened is sufficient. Knott v. Morgan, 2 Keen, 213; Lee v. Haley, 5 Ch. App. 155; Thread Co. v. Armitage, 45 U. S. App. 62, 73, 21 C. C. A. 178, 186, 74 Fed. 936, 944.

The decree of the circuit court is in perfect accord with these principles and authorities. The appellants were using the word "American" and the names of the appellee's manufactured articles with the intent and for the sole purpose of selling the manufactures of others as those of the appellee, and they were accomplishing this illegal end. The only effectual method of preventing the continuous perpetration of this fraud and of protecting the good will of the business of the appellee from injury or destruction was to enjoin the appellants from applying the names of the appellee's articles to the manufactures of others, and the court wisely and lawfully granted that relief. This conclusion ends the discussion of the real issue in hand, and practically determines the decision of this case. A few minor objections to the decree which do not require extended consideration will be briefly noticed.

Counsel for appellants maintain that the fact that they have placed their names and residence in conspicuous places on their packages, and have otherwise distinguished them from those of the appellee, should relieve them from the injunction. But the "American Ball Blue" and the "American Wash Blue" were articles well known to the trade and to the public as the manufactures of the appellee before the appellants entered upon the business of selling bluing. These articles, and the names by which they were known, had an established reputation, and commanded a lucrative trade. To the dealers in bluing the appellants were unknown. The only effect of placing their unfamiliar names and residence upon the packages of bluing under the names of the appellee's well-known articles was to give to the appellants the benefit of the established reputation of the appellee's articles, and thus to enable them to derive greater benefit from their fraud. "That is an aggravation, and not a justification, for it is openly trading in the name of another upon the reputation acquired by the device of the proprietor." Menendez v. Holt, 128 U. S. 514, 521, 9 Sup. Ct. 143, 32 L. Ed. 526; Gillott v. Esterbrook, 48 N. Y. 374, 378, 8 Am. Rep. 553.

It is said that the appellee was entitled to no relief because the names "American Ball Blue" and "American Wash Blue" do not denote origin or ownership, and therefore cannot constitute trademarks, and because the appellee registered its trade-mark, which did not consist of any of the words constituting these names, and it thereby disclaimed their use as trade-marks. But this is not a suit for the infringement of trade-marks, but to restrain the sale of the goods of one manufacturer as those of another, and a complainant has the same right to an injunction against the perpetration of such a fraud by the use of words or names which do not in themselves indicate origin or ownership, and which are incapable of use and are disclaimed as trade-marks, as he has against its commission by the use of any other terms or expressions. Whether the brands "American

108 F.—53

Ball Blue" and "American Wash Blue" indicated the origin and ownership of the articles to which they were applied in 1872 and 1874, when they were first used, or not, the evidence is overwhelming that by association they came to point out to the trade articles made and owned by the appellee long before 1898, when the appellants first appropriated them, and it was for this reason alone that they used them in their endeavor to deceive the public and to filch the business of the appellee. These facts furnish ample grounds for the injunction whether the words were capable of use as trade-marks or not.

The appellee has, since 1895, been engaged in manufacturing and selling bluing under the names "Germania Ball Blue" and "Bavarian Ball Blue" in boxes simulating foreign products, and counsel for appellants insist that these names were false and misleading, and that the appellee was entitled to no relief from a court of equity, because it did not come with clean hands. The principle that "he who comes into equity must do so with clean hands" is familiar and indisputable. But it does not repel all sinners from courts of equity, nor does it disqualify any complainant from obtaining relief there who has not dealt unjustly in the very transaction concerning which he complains. The iniquity which will repel him must have an immediate and necessary relation to the equity for which he sues. Dering v. Earl of Winchelsea, 1 Cox, Ch. 318, 319; Lewis & Nelson's Appeal, 67 Pa. 153, 166; Bateman v. Fargason, 4 Fed. 32, 33; Bisp. Eq. 61. There is no evidence that the appellee has been guilty of any injustice, fraud, or wrong in acquiring the good will of its business in the American ball blue and the American wash blue, which is the subject of this suit, or in its relations with the appellants, and relief cannot be denied to it because it may have been wicked in other transactions which affect neither the appellants nor the equity here under consideration. The decree below is affirmed.

THAYER, Circuit Judge (dissenting). As I have reached a conclusion different from that announced by my associates, I deem it proper to state my views concerning the questions of law and fact which arise in the case, and, first, with respect to the facts. The Heller & Merz Company, hereafter termed the "complainant," or its predecessors, began the manufacture of bluing, as it seems, at Newark, N. J., about the year 1868 or 1869. At first they manufactured bluing only in the form of a powder. Later, in the year 1872, they began to put it up in the form of round pellets or balls about the size of small marbles; and later still, in the year 1874 or 1875, they began to manufacture bluing, to some extent, in the form of round lozenges or wafers. To the bluing which was put up in the form of balls they applied the name "American Ball Blue," and to that put up in the form of round lozenges they claim to have applied the name "American Wash Blue" when they first began to manufacture it in that form. The evidence shows, however, that what is now termed "American Wash Blue" was as commonly, and perhaps more frequently, termed "Lozenger Blue" until the year 1878, when Pomeroy & Olmsted, a firm which subsequently be-

came G. M. Olmsted & Co., took hold of the latter kind of bluing, and advertised it extensively in the Northwest, with the consent of the complainant, as an article of their own manufacture, under the name "American Wash Blue." Even while Olmsted & Co. were thus advertising and selling it as their own product under the name "American Wash Blue," the plaintiff company most frequently referred to it in their letters and bills as "Lozenger Blue." To my mind, the evidence leaves little room for doubt that the words "American Ball Blue" and "American Wash Blue" were originally adopted by the complainant itself solely for descriptive purposes,— that is to say, to describe a bluing made in the United States, and to be used for laundry purposes; the one kind put up in the form of balls, and the other in the shape of round lozenges. There is no evidence, I think, which indicates that either name was chosen as an artificial brand, but the testimony rather indicates that the names were selected because they accurately described the articles to which they were applied, the word "American" differentiating them from several kinds of bluing which were made abroad, and imported into this country for sale. Olmsted & Co., who were soap makers at Cedar Rapids, Iowa, for 20 years succeeding the year 1878, advertised bluing put up in the form of round lozenges, extensively, as "American Wash Blue," throughout the states of Iowa, Minnesota, and the Dakota territories, and built up an extensive trade in the article in those states and territories. The bluing was put up in cylindrical-shaped blue paper boxes of sufficient diameter to contain the lozenges. The cylindrical boxes bore on one end a white label on which was stamped the letter "U" surrounded by a small triangle, and on the three sides of this triangle were printed in very small letters the words "American Ultramarine Works. Trade-Mark." Wrapped around the cylindrical box was another larger label, commending the qualities of the article, and giving directions for its use, which was signed as follows: "G. M. Olmsted & Company, Soap Makers, Cedar Rapids, Iowa." The small cylindrical paper boxes were packed in larger wooden ones, on the ends of which were stenciled the following words: "American Wash Blue. G. M. Olmsted & Co., Cedar Rapids, Iowa." The packages of American wash blue as put up and sold by Olmsted & Co. with the full knowledge of the complainant bore no marks indicating to the public that the article was made by the complainant other than the above-described label on the end of the cylindrical boxes, and the evidence shows beyond peradventure that nearly all of Olmsted's customers were ignorant of the existence of such a concern as the Heller & Merz Company, and supposed that the article was made by or for Olmsted & Co., and that the words "American Wash Blue" were wholly descriptive. While Olmsted & Co. handled American wash blue,—that is to say, for 20 years succeeding the year 1878,—the complainant manufactured and sold no other lozenger bluing, except a small amount in the states of Illinois and Wisconsin. They manufactured bluing in that form for 20 years, principally to fill orders for Olmsted & Co. The defendants below, Shaver, Blake & Co., acquired the good will of the business of Olmsted & Co. when the latter firm was dissolved

by the death of one of its members. Shortly thereafter, in the year 1898, they commenced to advertise and sell lozenger blue in the same form of package that it had been sold by Olmsted & Co., using the words "American Wash Blue," as their predecessor in interest had used them; but they ceased to affix the label at the end of the cylindrical boxes which bore the impress of the letter "U" surrounded by the triangle above described. The defendants purchased the bluing from, or had it manufactured for them by, the International Ultramarine Works located at Staten Island, N. Y., and they ceased to patronize the complainant company. Thereupon, as it seems, the complainant began to sell American wash blue put up in the form of lozenges in the territory formerly occupied by Olmsted & Co., and—to retaliate apparently, as Olmsted & Co. had never sold the ball blue—the defendants began to advertise and sell it as well as the wash blue. The boxes, however, in which the defendants packed and sold ball blue which was manufactured for them by the International Ultramarine Works, bore no resemblance whatever to the boxes in which the complainant had theretofore packed and sold its ball blue. The defendants' boxes were different in color, and had the words "Shaver, Blake & Company, Cedar Rapids, Iowa," prominently displayed on the face of the boxes. No one, in my judgment, could have possibly mistaken the defendants' ball blue for similar goods of the complainant's manufacture, if he had exercised the slightest care. Moreover, this record fails to show that there is any substantial difference in the bluing made by the complainant and by the International Ultramarine Works. The article manufactured by each concern is the same, and nothing in this record would indicate that one is a better article than the other. This litigation, as I view it, is the outgrowth of the foregoing facts.

The decree of the lower court, which is approved by the majority opinion, enjoins the defendants, among other things, from selling or offering for sale any blue or bluing under the name "American Wash Blue" or "American Ball Blue" unless it is manufactured by the complainant company. It is also said in the majority opinion that the defendants "have no right to make or sell American ball blue or American wash blue"; and, furthermore, that "the names of the articles in which they [the defendants] have the right to deal are 'Ball Blue' or 'Wash Blue.'" At the same time it is conceded in the majority opinion—and of this proposition there can be no doubt—that the words "American Wash Blue" and "American Ball Blue" are purely descriptive words and phrases, which cannot be monopolized as a trade-mark by any manufacturer of bluing. To my mind, the two propositions thus announced are antagonistic, namely, that a manufacturer of bluing cannot, as respects that article, obtain a monopoly of the aforesaid words and phrases, because they are confessedly descriptive, but that he may make use of the words himself, and enjoin another manufacturer, who makes the same article, from using them to describe his own product. If the latter of these propositions is sound law, then it is apparent, I think, that the former proposition ought to be abandoned, and that it be henceforth conceded that one

of the fundamental doctrines of the law of trade-mark is no longer tenable, namely, that no one is entitled to monopolize either words or phrases, which, as applied to a given article, are purely descriptive of its kind, or quality, or place of manufacture. It will be observed that the opinion of the majority concedes the defendants' right to sell their product under the names "Ball Blue" and "Wash Blue," but denies their right to make use of the word "American" in connection therewith, and I am unable to perceive any substantial reason why the right to use the former of these words should be admitted, and the right to use the latter denied. The word "American" is no less descriptive than the words "Wash Blue" or the words "Ball Blue." It indicates that the bluing is made in America, and is a domestic product, just as the word "Wash" indicates that the bluing is designed for washing purposes, and the word "Ball" indicates that the bluing is put up in the form of small pellets. The words in question are each purely descriptive, and, as the complainant company and as the defendants both employ them, they are used in a very natural relation to each other to aptly describe the two articles to which they are applied, and to show that they are a domestic, and not a foreign, product.

Another observation to be made concerning the decree below and the majority opinion is that the relief afforded is not based on the ground that the descriptive words in question have been used on boxes or packages containing bluing which are made in imitation of the complainant's boxes and packages, and for that reason are liable to deceive the public, and lessen the complainant's trade. The injunction is so framed that the phrases "American Wash Blue" and "American Ball Blue" cannot be used by the defendants under any circumstances, even though they put up ball blue and lozenger blue in boxes which are so totally unlike those employed by the complainant that they would not mislead a customer who was grossly negligent. The injunction against using the words, therefore, is not founded upon any deception practiced or attempted to be practiced, except such as may result from the use of words in a purely natural relation to each other, which are confessedly descriptive, and cannot be monopolized as a trade-mark. The reason assigned for awarding such an injunction is that it may be granted on the ground that the defendants employ these words with intent to purloin some of the complainant's trade, and that their conduct in so doing is fraudulent. But, in my opinion, an appropriate answer to this suggestion is that a person cannot be said to have been guilty of any such fraud as a court of law or equity will redress when he makes use of words or phrases to describe an article which he manufactures, which, as applied to that article, are purely descriptive, and hence are the common property of all who manufacture or deal in the article. The law, except in a few rare cases, does not concern itself with the motives of men when their acts are lawful, and injuries which result to others from the exercise of lawful rights or privileges are damnum absque injuria. Passaic Print Works v. Ely & Walker Dry-Goods Co., 44 C. C. A. 426, 105 Fed. 163. If the words "American Wash Blue" and "American Ball Blue," as the complainant contends, have

become associated in the public mind with two articles which it manufactures in such a way that they have ceased to be descriptive of the articles, and have acquired a meaning which is secondary and arbitrary, then this result is attributable to the complainant's own fault. If such a result was liable to ensue, it should have chosen a brand originally which was arbitrary, and that might have been monopolized. It had no greater need of employing the descriptive words in question than the defendants have to describe the bluing which they sell. It cannot, therefore, by reason of the peculiar result above mentioned, insist that other manufacturers of bluing in this country shall not call their product "American Wash Blue" and "American Ball Blue" if it is so in fact. It requires but little penetration to see that, if this doctrine of "secondary signification" is adopted in these days of fierce competition, the most common descriptive words and phrases will be monopolized, or at least that attempts will be made repeatedly to monopolize them, and little difficulty will ordinarily be experienced in obtaining testimony to support the claim that common and necessary descriptive words have by long-continued use acquired a secondary meaning. I am willing to concede that one or two English cases cited in the majority opinion, particularly Thompson v. Montgomery, 41 Ch. Div. 35, and the same case as reported in [1891] App. Cas. 217, sustain the doctrine contended for by my associates that a descriptive word by association with an article may acquire a secondary signification, and that, when such secondary meaning has been acquired, the use of it by another may be enjoined; but, as I read and construe the American decisions,—particularly the decisions of the supreme court, which are controlling authority here,—the doctrine in question has not been approved to the extent to which it has been carried in the case in hand. In Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 Sup. Ct. 1002, 41 L. Ed. 118, the right of the public to make use of the word "Singer" as descriptive of a particular sewing machine after the expiration of the patent on the machine was upheld, with the single limitation that one who makes such machines, and calls them by that name, must, by other marks and signs on the machines, clearly indicate to the public that they are made by him, and not by the original Singer Company. The recent case of Elgin Nat. Watch Co. v. Illinois Watch-Case Co. (decided Jan. 7, 1901) 21 Sup. Ct. 270, 45 L. Ed. 365, as I construe it, inculcates the same doctrine, namely, that a manufacturer cannot be enjoined from making use of words or phrases which in their primary sense are clearly descriptive of the article which he manufactures, and that, even when such words, as used by another, have acquired a secondary signification, the most that a court of equity can do for his protection is to require third parties who have occasion to use them to affix other marks and signs, or indulge in such explanations, as will most effectually prevent a confusion of goods. These are the latest decisions by the supreme court on the subject, but prior thereto it was said in Chemical Co. v. Meyer, 139 U. S. 540, 547, 11 Sup. Ct. 625, 35 L. Ed. 247, concerning descriptive words which could not become a trade-mark:

"If the words * * * cannot be lawfully appropriated as a trade-mark, it is difficult to see upon what theory a person making use of these or similar words can be enjoined. We understand it to be conceded that these words do not in themselves constitute a trade-mark. It follows, then, that another person has the right to use them unless he uses them in such connection with other words or devices as operate as a deception upon the public."

Similar views were also expressed in the case of Goodyear's India-Rubber Glove Mfg. Co. v. Goodyear Rubber Co., 128 U. S. 598, 602, 9 Sup. Ct. 166, 32 L. Ed. 535. See, also, Illinois Watch-Case Co. v. Elgin Nat. Watch Co., 35 C. C. A. 237, 94 Fed. 667.

My conclusion is, therefore, that the injunction in its present form ought not to stand, because the defendants have the right to use the words "American Wash Blue" and "American Ball Blue," and to use the words in that relation to each other, these being clearly descriptive words and phrases, provided they neither simulate the complainant's boxes or packages, and provided they display their own name prominently on their boxes, circulars, and advertisements, and with equal prominence state that the bluing which they sell is manufactured for them by the International Ultramarine Works of Staten Island, N. Y., and is not the complainant's product. I have no fault to find with that part of the restraining order which enjoins the defendants from holding themselves out to the public as the owners of the names "American Wash Blue" and "American Ball Blue," or as the manufacturers of those articles, since no one, in my judgment, is or can be the owner of these names, or have an exclusive property therein.