BY THE

ST. LOUIS, KANSAS CITY AND SPRINGFIELD

# COURTS OF APPEALS

AT THE

MARCH TERM, 1912.

THE McGREW COAL COMPANY, Appellant, v.
W. J. MENEFEE, Respondent.

**Kansas City Court of Appeals, March 4, 1912.**

1. **TRADEMARK: Equity.** Plaintiff seeks to enjoin defendant from infringing a trademark. It was shown that plaintiff acquired by purchase the coal mines and business of J. C. McGrew which included a registered trademark "McGrew's Electric Lump" which was used in advertising the products of his coal mines. Defendant, used the name "Menefee's Electric Lump." *Held*, that there was no infringement.

2. —————: **Unfair Trade.** No one should be suffered to sell his goods as the goods of a competitor or to acquire a practical monopoly of a commodity of general consumption by the employment of a trade name composed of merely descriptive words.

Appeal from Pettis Circuit Court.—*Hon. Louis Hoffman*, Judge.

AFFIRMED.

*Geo. F. Longan* and *J. T. Montgomery* for appellant.

*Barnett & Barnett* for respondent.

162 App.—14       (209)

JOHNSON, J.—This is a suit in equity to enjoin defendant from infringing a trademark of plaintiff and from injuring its business by using a trade name to the use of which plaintiff alleges it has the sole proprietary right. The answer is a general denial. On final hearing the court decided the issues in favor of defendant and dismissed the bill. Plaintiff appealed.

For many years J. C. McGrew was the owner and operator of large coal mines near Lexington. There were other mines in the same district and practically the same kind and quality of bituminous coal was mined throughout the district. Plaintiff claims the coal taken from the McGrew mines was better than the coal from other mines but all of the coal was mined from the same vein and we think the evidence as a whole does not disclose any marked superiority in the McGrew coal. About fifteen years ago the large operators in the district, including McGrew, began using electric cutting machines and thereby were enabled to extract the coal in larger, cleaner lumps and with less slack and dust than they had been able to do under old methods. The use of such machines by miners of bituminous coal has become general and most of such coal sold in the markets has been mined with the aid of such machines.

Shortly after he began using the machines McGrew adopted "McGrew's Electric Lump" as a trade name and used it to designate the coal shipped from his mines. In 1905 he filed in the office of the Commissioner of Patents the advertising label he had been using and in 1907 his trademark "McGrew's Electric Lump" was registered in the Patent Office and a certificate of registration was issued to him by the commissioner. In 1908 he sold his mines and mining business, including his trademark and copyright to plaintiff. It has been the uniform custom of plaintiff and its predecessor to use the registered label in

advertising the mines by pasting such labels on cars and lumps of coal in conspicuous places. The registered label is in the form and semblance of a flaming disc or wheel. In the center of the disc is a large, black, clean-looking lump of coal in ardent combustion, this effect being produced by a combination of colors representing flames radiating in all directions from the lump. This fervent foreground is set against a white field enclosed by the luminous border. Across the face of the lump are the words ''Electric Lump'' in heavy white letters. Above and below the lump and in the foreground are the words ''trademark.'' In a circle enclosing the foreground are the words ''J. C. McGrew, Producer and shipper, Lexington, Mo.,'' in red letters. Beyond these words and in a larger circle set against the white field are the words ''McGrew's Electric Lump Coal'' in very large black letters. The word ''coal'' is at the bottom of the circle and is shaded in red. The *tout ensemble* is decidedly striking and gives an impression of a burning sun deriving its heat from a lump of coal. In addition to the effect on the eye of an arrangement of red, yellow and white in resemblance of intense heat are the scarcely less attractive contrasting combinations of a white work on a black background and a black work on a white background. It is not hard to believe that the liberal and continuous use of a label so garish would serve to identify the name ''Electric Lump'' with coal produced at plaintiff's mine.

Defendant is a retail coal dealer in Sedalia. In 1904 he became the agent in Sedalia for the sale of McGrew's coal and in 1906 was given the sole agency for that city. At first defendant used McGrew's trademark in advertising his business but in time discontinued the practice and began advertising the business in his own name and made a feature of the name ''Menefee's Electric Lump'' in his advertisements.

He had this name painted in ordinary letters on his delivery wagons and on a sign at his place of business and used the name in newspaper advertising. McGrew objected to the name, claiming its use was an infringement of his trademark. The subject was discussed in a prolonged correspondence between the parties in the course of which defendant changed the name to "Menefee's Electro Lump." This did not satisfy McGrew and later defendant again changed the name making it "Menefee's Elective Lump." McGrew was not mollified by the second change and becoming convinced that defendant intended to continue in his objectionable conduct, terminated the agency. Defendant then bought coal of another operator in the Lexington district and as this operator used electric machines in mining, defendant continued to use "Menefee's Elective Lump" as his trade name.

Plaintiff alleges in the petition "that the name 'Electric Lump' was given to this coal by the said James C. McGrew because it was mined and gotten out by means of electric machinery and in that manner was gotten out in larger lumps and in more desirable form for the market and was more valuable for the trade than coal mined in the ordinary way."

Defendant did not use any label or any device or symbol, nor did he in any manner affix his trade name to coal sold by him. The extent of the use he made of the name was to paint it in plain letters on his wagons, his business sign, and to use it in his newspaper advertisements. In such state of case the cause of action alleged in the petition must rest, if at all, on the idea that the use by defendant of the words "Electric Lump" was an infringement of plaintiff's trademark and if not such infringement, was, at least, such unfair competition, so violative of the principles and rules of fair trade as to afford plaintiff the redress he seeks.

At the outset we rule that the changes made by defendant in his trade name were ineffectual and worked no betterment of his position and status towards plaintiff. Of course the dictionary meanings of the words "electric," "electro," and "elective" are different, but the purpose of defendant to employ a term that would convey the impression to the public that he was selling coal mined by electricity was manifested by the words he selected and emphasized by the changes to which he resorted in a vain effort to pacify his principal and still to retain a popular trade name.

We shall disregard the changes and treat the name as still being "Menefee's Electric Lump." We do not sanction the view of plaintiff that these changes evinced a fraudulent intent of defendant to commit an act of piracy. He knew that McGrew claimed an exclusive right to use the name "Electric Lump" and made the changes under stress of McGrew's threat to terminate the agency and to force him into annoying and expensive litigation. Defendant contended, and we think with honest intent, that he was violating no right of plaintiff. His efforts to avert such unpleasant consequences are compatible with the idea that he was willing to purchase peace at the sacrifice of some, but not all, of his rights. The actions of men often are prompted by such motive. Since the conduct of defendant is as consistent with an honest as with a sinister motive, we are disposed to give him the benefit of the doubt. [Seed Co. v. Seed Co., 37 Mo. App. 313.]

This brings us to the decisive question in the case, viz., Did the use of the name "Menefee's Electric Lump" constitute a violation of the right of plaintiff to the exclusive use of the name "Electric Lump?" We say there was no infringement of the trademark issued to plaintiff and for this conclusion we shall state but one of several reasons that occur to us. The allega-

tions of the petition and the proof disclose beyond
question that the words do not denote the origin or
ownership of the commodity to which they refer but
are merely descriptive of the quality of a commodity
of general consumption. But since this reason is one
we must discuss in our consideration of the question
of whether or not defendant has been guilty of an
offense against the laws of fair trade and since the
doctrine of fair trade covers a much larger field than
that of trademark rights, we shall pass at once to
the consideration of the larger and, in this case, all
inclusive question.

The doctrine of fair trade, or, as it is otherwise
called, of unfair competition, thus is well expounded
by Judge NORTONI in Grocers Journal v. Midland Pub.
Co., 127 Mo. App. l. c. 366:

"However this may be, we find that in keeping
with the Christian influence of advancing civilization,
the courts have evolved out of the technical law of
trademarks a just doctrine, well-founded, and known
as the law of unfair trade, the underlying principle of
which is not only sound and broad but eminently more
concerned with the justice of the cause than was our
ancient jurisprudence with reference to infringements
of the trademark. Now the broad principle, funda-
mental of the doctrine incorporated in the law of un-
fair competition, is that irrespective of the proprie-
tary interest in the word or symbol which constitutes
the trademark, and for that matter, irrespective of
the entire question of technical trademark, one man
has no right to palm off his goods or wares as those
of another. This is true for two very sufficient rea-
sons. First, a man who has established a reputation
for his goods, by the excellence of his product, under
a given mark or symbol indicating its origin or man-
ufacture, is by all means entitled to be protected in
the enjoyment of the good-will, of the fruits and the
reputation of the business thus established by his up-

rightness, integrity and industry; and second, on the other hand, those members of the public who purchase a commodity are of right entitled to have precisely what they purchase and to this end should be protected against the fraud and deceit of whomsoever places another and different or counterfeit article upon the market under a mark or symbol in the similitude, likeness, or in the dress of the genuine. [Elgin, etc., Watch Co. v. Illinois, etc., Watch Co., 179 U. S. 665-674; Coates v. Merrick Thread Co., 149 U. S. 562-566; Shaver v. Heller & Mertz Co., 108 Fed. 821-826; McLean v. Fleming, 96 U. S. 245; 28 Amer. & Eng. Encyc. Law (2 Ed.), 345 to 350; Browne on Trademarks (2 Ed.), sec. 43.]''

The gist of the whole doctrine lies in the axiomatic rule first announced in a case before the House of Lords that no man has a right to sell his goods as the goods of another. In the application of that rule courts often go far beyond the limits of the technical rules of trademark law and, regarding each case as in a sense *sui generis,* endeavor to reach a conclusion in keeping with the real equity of its particular facts. Consequently, the books contain many decisions wherein the rule that no proprietary rights can be founded on the use of geographical names or of words merely descriptive of the quality of the commodity is modified to conform to the equitable demands of the peculiar facts and circumstances of the case and a secondary meaning is accorded to such words and on such meaning a proprietary right is predicated. Thus in a leading case cited in briefs of counsel, a large factory was established in a small, obscure village and its product was sold in the markets under a name in which the name of the village had the most conspicuous place. After building up a large trade under that name the factory was moved to another city. Afterward another factory of the same kind was started in the village and its proprie-

tors sought to purloin the trade of the old concern by taking the same name. The court held that the name of the village had acquired a secondary meaning and that the attempt of the new concern was an act of piracy.

It would be tedious and unremunerative to go into a discussion and analysis of the case law on the subject. The entire doctrine fundamental of every case of unfair competition may be compressed into two general and most just rules. First, the one we have stated that no man should be suffered to sell his goods as the goods of a competitor and, second, the rule restrictive of the first that no man should be allowed to acquire a practical monopoly of a commodity of general consumption by the employment of a trade name composed of merely descriptive words. Monopolies are odious to the people and abhorrent to equity and never should be tolerated except as to those things that essentially are monopolistic, such as public utilities, patent rights, etc. It is one thing for a vendor to establish a demand for a commodity sold by him by the use of an arbitrary trade name that points the public mind to the fact that he is the sole vendor of a particular brand of such commodity and it is quite another and different thing for him to attempt to monopolize the trade by preventing competitors from using words descriptive of quality in their advertisements. "Thus," says Judge Lewis in Trask Fish Co. v. Wooster, 28 Mo. App. 408, "if a grocer should brand or label the words, 'Best Brown Sugar' on every parcel of that article sold by him, would it ever be supposed that all other grocers should be thereby precluded from using the same words in connection with their sales of the same article? Such a restriction would create a monopoly in the hands of any man who might so elect, in the commonest products of universal consumption and use."

Bituminous coal is a commodity of general use in this state. It is as much a staple article of consumption as sugar and coffee. It is a matter of common knowledge that the ordinary consumer prefers to buy the coal that comes in the largest lumps and is most free of slack and dust. The word "lump," therefore, refers to quality and certainly no dealer should be allowed the exclusive use of that word. The word "Electric" has a general, well-understood meaning, i. e., that the coal was mined by electric machines and, therefore, is cleaner and in larger lumps than coal mined in the old way. Used as an adjective to the noun lump the term thus formed is descriptive of quality only. The claim of plaintiff that it has an exclusive right to the use of that term in practical effect is the assertion of a right to monopolize the sale of coal mined by the new and now general method since the enjoyment of the exclusive right to advertise coal of such quality would amount to a monopoly of the sale of such coal.

Thus it appears that plaintiff is founding its cause of action, not upon its own skill, genius and industry, but upon its voluntary appropriation of a term that in all equity and good conscience should be regarded as common property which any dealer in coal mined by electricity may use in advertising his business. Plaintiff acquired no property right in the name "Electric Lump" and the learned trial judge took a proper view of the case in dismissing the bill.

The judgment is affirmed. All concur.